IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KEITH YOHO,
Plaintiff,
v.
THE BANK OF NEW YORK MELLON CORPORATION, *et al.*,
Defendants.

2:17-cv-917-NR

**OPINION**

Defendants BNY Mellon Corporation, MSBC Securities Corporation, and the Dreyfus Corporation[1] move for summary judgment on Plaintiff Keith Yoho's employment-discrimination and related tort claims. ECF 82. After careful consideration, the Court will grant Defendants' motion, and enter judgment in favor of Defendants on all claims.

**BACKGROUND**

Considering the evidence here in Mr. Yoho's favor, Mr. Yoho was a "Senior Wholesaler" for BNY from February 28, 2005 until his termination on September 7, 2016. ECF 84, ¶ 1; ECF 91, ¶ 1. There is no dispute that he excelled in that role. Indeed, throughout his tenure, Mr. Yoho was routinely one of BNY's top-performing wholesalers. ECF 78, ¶ 7; ECF 86, ¶ 7.

In early September 2016, Mr. Yoho was terminated by BNY after an investigation into several allegations of misconduct toward female employees at sales conferences in Chicago and San Diego that occurred just a few weeks earlier, in mid-August 2016. The allegations included: (1) that Mr. Yoho told another employee, Christine Noland, that her "fat ass" gave him "such a hard-on" while they were standing together at a hotel bar (ECF 84, ¶ 14; ECF 91, ¶ 14); (2) that Mr. Yoho called

[1] MSBC Securities Corporation and the Dreyfus Corporation are subsidiaries of entities that are themselves subsidiaries of the BNY Mellon Corporation. ECF 8. The Court refers to the Defendants interchangeably throughout this opinion as "BNY."

the hotel room of a junior employee, Britney Curtin, late at night (ECF 84, ¶¶ 15-16; ECF 91, ¶¶ 15-16); (3) that Mr. Yoho drunkenly told another female employee, Audrey Seybert, that she was "too old" to be his "perfect age to date" but nonetheless "look[ed] great" (ECF 84, ¶¶ 18-19; ECF 85-9, pp. 41:1-6; ECF 91, ¶¶ 18-19); and (4) that Mr. Yoho told another employee, Bria Gilbert, that she had a "sexy" Australian accent, and that a "great idea for a sales campaign" would be to use her picture in an email to his clients. ECF 84, ¶ 21; ECF 85-8, pp. 27:24-28:6; ECF 91, ¶ 21.[2]

For each of these incidents, Mr. Yoho offers a denial or explanation. The "hard-on" comment was "fabricated" by Ms. Noland, with whom he had a rocky and rivalrous relationship. ECF 91, ¶ 14. The "late-night phone call" to Ms. Curtin was to offer her leftover beer from his room, before he left the hotel with a friend, because Ms. Curtin had mentioned "want[ing] more beer" after "the [hotel] bar closed." ECF 85-3, p. 173:5-12. The comment about Ms. Seybert's age was an innocent reference to a "psychological study" regarding the perfect age for a romantic partner, and Mr. Yoho did not "recall saying that [he] wanted to date [Ms. Seybert] or [that] she was too old to date." *Id.* at pp. 126:25-127:6. Finally, the reference to Bria Gilbert's "sexy" Australian accent was actually a comment "about Margot Robbie, the [Australian] actress," to the effect "that [he] liked her accent," while the comment about using Ms. Gilbert's picture was "a compliment." *Id.* at pp. 188:24-189:5, 190:15-20.

Whatever the truth behind these allegations (and the Court credits Mr. Yoho's testimony) the story of how they came to BNY's attention is, in all material respects, undisputed. True or not, Christine Noland reported the "hard-on" comment to Ryland Pruett, Mr. Yoho's "second-level" supervisor. ECF 92-2, p. 155:11-22; ECF 85-7, p. 199:20-22. Mr. Pruett testified that Ms. Noland did so at the same hotel-bar event

[2] Audrey Seybert also testified about a fifth incident, during a social event aboard the USS Midway during the San Diego conference, where an intoxicated Mr. Yoho repeatedly placed his hand on her lower back until another male employee intervened. ECF 84, ¶ 20; ECF 91, ¶ 20.

where the incident occurred. ECF 92-2, pp. 155:11-22. The next morning, Ms. Noland spoke to Britney Curtin and learned about Mr. Yoho's phone call to her hotel room. ECF 85-7, pp. 213:11-214:15. Ms. Curtin didn't find the phone call inappropriate and didn't really want to report it, but Ms. Noland reported it to Mr. Pruett anyway. *Id.* at p. 233:2-13; ECF 85-10, pp. 45:9-46:13, 51:13-52:18. Soon after, Ms. Noland spoke to Ms. Seybert and Ms. Gilbert about Mr. Yoho, and they told her about the other incidents. ECF 85-7, pp. 288:20-289:21, 292:2-8. At Ms. Noland's request, Ms. Seybert and Ms. Gilbert met with Mr. Pruett, who listened to their complaints and then reported Mr. Yoho to BNY's Human Resources department. ECF 84, ¶ 22; ECF 91, ¶ 22.

After the incidents were reported to HR, HR dispatched an employee named Thomas Galante to investigate. ECF 84, ¶ 23; ECF 91, ¶ 23. He did so, interviewing Mr. Pruett, Ms. Noland, Ms. Curtin, Ms. Seybert, Ms. Gilbert, an employee named Nick Vanderlinden, and, finally, Mr. Yoho. ECF 84, ¶ 24; ECF 91, ¶ 24. He then reported to a group consisting of BNY's in-house attorneys, HR personnel, Mr. Pruett, and Mr. Pruett's supervisor, Joe Moran. ECF 85-4, pp. 172:9-16, 316:1-9, 332:1-5, 341:1-14. BNY asserts that it concluded Mr. Yoho had violated its "Code of Conduct" and "Sexual and Other Discriminatory Harassment Policy," and decided to terminate his employment. ECF 85-15, pp. 7:7-8:5, 56:1-20. As Mr. Yoho's supervisor, Mr. Pruett bore ultimate responsibility for the termination decision. ECF 79-4, p. 5; ECF 79-22, pp. 71:24-72:2. He delivered the news to Mr. Yoho by reading a statement prepared by HR over the phone. ECF 85-4, p. 318:19-319:10.

Mr. Yoho's view of all this, and the basis for his lawsuit, is that the whole investigation was a pretextual sham to fire him because he was an alcoholic (a disability under the ADA), or because BNY viewed him as too old to keep up with what he characterized as the fast-paced, alcohol-soaked lifestyle of wholesaling financial securities. He asserts that Ms. Noland fabricated the "hard-on" comment,

and then encouraged the other employees to report (and either fabricate or exaggerate) minor incidents that did not warrant termination. Mr. Yoho argues that BNY used these false or exaggerated allegations as an excuse to rid itself of him for discriminatory reasons. Separately, he also presses several other claims (*e.g.*, disability-accommodation, tortious-interference, and defamation claims) that arise from a set of different, discrete facts, which are discussed below.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment, the Court must ask whether the evidence presents "a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In making that decision, the Court must "consider all evidence in the light most favorable to the party opposing the motion." *A.W. v. Jersey City Pub. Schs.*, 486 F.3d 791, 794 (3d Cir. 2007).

The summary-judgment stage "is essentially 'put up or shut up' time for the non-moving party," which "must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." *Berckeley Inv. Grp. Ltd. v. Colkitt*, 455 F.3d 195, 201 (3d Cir. 2006). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is warranted. *Celotext Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

## DISCUSSION & ANALYSIS

In his complaint, Mr. Yoho asserts claims for disability discrimination (Count 1), age discrimination (Count 2), hostile work environment (Count 3), sex or gender discrimination (Count 4), retaliation (Count 5), defamation (Count 6), tortious interference (Count 7), and corresponding violations of the Pennsylvania Human

Relations Act, or "PHRA" (Count 8). For the following reasons, there is insufficient evidence to support the essential elements of Mr. Yoho's claims, and BNY is therefore entitled to summary judgment.

## I. Mr. Yoho has forfeited his retaliation claim and conceded his hostile work environment and gender discrimination claims.

Preliminarily, Mr. Yoho has either conceded or forfeited several of the claims pled in his complaint. First, Mr. Yoho concedes that summary judgment should be granted on his gender discrimination and hostile work environment claims. ECF 90, p. 20 n.15. The Court grants summary judgment on those claims based on that concession, and also because Mr. Yoho testified that he did not believe he was discriminated against based on his sex or gender. ECF 85-3, pp. 235:22-236:4.

Next, the Court finds that Mr. Yoho has forfeited his retaliation claim. As pled in the complaint, Mr. Yoho's retaliation claim asserts that BNY retaliated against him by (1) "direct[ing] those within its control, including [Mr. Yoho's direct supervisor] [Tim] McCormick and others, to stop speaking with Mr. Yoho and to shun him"; and (2) "intentionally interfered with long-term relationships that Mr. Yoho possessed in an effort to retaliate against him for raising legitimate concerns about [BNY's] dishonest and illegal treatment of him." ECF 1, ¶¶ 257, 259. BNY moved for summary judgment on the grounds that Mr. Yoho did not allege, or show, that he engaged in any protected activity or suffered any adverse employment action related to this post-termination conduct. ECF 83, pp. 16-17.

In response, Mr. Yoho does not defend his original retaliation theory. Instead, his briefing transforms it into an entirely new claim that BNY retaliated against him for calling BNY's Employee Assistance Program, purportedly to seek help for his alcoholism, shortly before he was fired. ECF 90, pp. 11-13. This is a completely different claim than the retaliation claim pled in count 5 of the complaint, and it's too late for Mr. Yoho to assert it now. *See Bell v. City of Phila.*, 275 F. App'x 157, 160 (3d

Cir. 2008) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.") (cleaned up). Further, because Mr. Yoho makes no effort to defend or substantiate his original retaliation claim on summary judgment, the Court deems that claim to be forfeited and grants summary judgment in favor of BNY. *See Reeves v. Travelers Cos.*, 296 F. Supp. 3d 687, 692 (E.D. Pa. 2017) ("When a party opposing summary judgment responds to a summary judgment motion but fails to address the substance of any challenge to particular claims, that failure constitutes an abandonment of those causes of action and essentially acts as a waiver of these issues.") (cleaned up).

For these reasons, the Court enters summary judgment in BNY's favor on counts 3, 4, 5, and the analogous portions of his state-law claim under count 8.

## II. Mr. Yoho's disability-accommodation claim fails because he did not timely request an accommodation.

The Court will also grant summary judgment on Mr. Yoho's disability-accommodation claim. Mr. Yoho's claim is that BNY failed to accommodate his alcoholism by providing him with a requested leave of absence. This claim arises out of Mr. Yoho's phone call to BNY's confidential Employee Assistance Program, which is operated by a third party. Mr. Yoho testified that he contacted the EAP four days before he was fired to seek help for his drinking (ECF 85-3, pp. 119:21-120:4) while Mr. Yoho's close friend and supervisor, Tim McCormick, testified that he suggested Mr. Yoho call the EAP and request a leave of absence as a last-ditch effort to "save his position." ECF 85-14, pp. 211:23-212:5, 215:3-7. For purposes of this decision, the Court accepts Mr. Yoho's testimony that he called the EAP in good faith.

Either way, Mr. Yoho quickly met with Mr. McCormick after calling the EAP and told him that he had done so. ECF 85-3, p. 121:9-22. Mr. McCormick then told Mr. Yoho that he should take a leave of absence and advised Mr. Pruett that Mr. Yoho had called the EAP to seek help for alcoholism. *Id.* at 121:9-21; ECF 85-4, p. 314:11-

16. This led to a privileged meeting between Mr. Pruett, in-house counsel, and the other decision-makers to discuss Mr. Yoho's EAP call. ECF 85-4, p. 316:10-317:10. Ultimately, BNY decided to proceed with investigating and terminating Mr. Yoho. Mr. Yoho now argues that BNY violated the ADA by failing to accommodate his alcoholism in this moment, *i.e.,* by not offering him a leave of absence or other opportunity to receive treatment in lieu of termination.

The problem with this argument is that Mr. Yoho's request for leave, if it was a request at all,[3] came too late to trigger any duty by BNY to accommodate. The ADA does not require an employer "to terminate an ongoing disciplinary process based upon a *post hoc* request for reasonable accommodation." *Katz v. UPMC*, No. 16-1627, 2019 WL 3843041, at *8 (W.D. Pa. Aug. 15, 2019) (Cercone, J.). In other words, "[w]hen an employee requests an accommodation for the first time only after it becomes clear that an adverse employment action is imminent, such a request can be too little, too late." *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 90 (1st Cir. 2012) (cleaned up; collecting cases); *see also Parsons v. Auto Club Grp.*, 565 F. App'x 446, 449 (6th Cir. 2014) (same). Faced with a last-minute request of this kind, an employer has "no duty to engage in the interactive process" typically required by the ADA, or to provide any "reasonable accommodation," even if the employee alleges that the misconduct under investigation was caused by his or her disability. *Katz*, 2019 WL 3843041 at *9; *see also Palmer v. Fed. Express Corp.*, 235 F. Supp. 3d 702, 722 (W.D. Pa. 2016) (Bissoon, J.) ("The ADA, however, does not require that an employer excuse

[3] Mr. Yoho testified that Mr. McCormick recommended that he take a leave of absence. ECF 85-3, p. 122:16-21. But he also testified that he never agreed to do so or formally requested leave from BNY. In fact, he explained that he did not want to take a leave of absence for financial reasons—he would have received only his "base salary and not commission." *Id.* at p. 123:2-12. At most, he suggested that he might have used some vacation time if he had not been fired. *Id*. For present purposes, the Court assumes that this amounted to an indirect request for time off.

an employee's previous misconduct, even if it was precipitated by his or her disability.") (cleaned up); *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 465 (4th Cir. 2012) ("[T]he law does not require the school to ignore misconduct that has occurred because the student subsequently asserts it was the result of a disability."); *McElwee v. Cty. of Orange*, 700 F.3d 635, 641 (2d Cir. 2012) ("A requested accommodation that simply excuses past misconduct is unreasonable as a matter of law.") (citations omitted); *Davila v. Qwest Corp.*, 113 F. App'x 849, 854 (10th Cir. 2004) ("[E]xcusing workplace misconduct to provide a fresh start/second chance to an employee whose disability could be offered as an after-the-fact excuse is not a required accommodation under the ADA.") (citations omitted).

The same goes here. At best, Mr. Yoho sought an accommodation for his alcoholism well after BNY began investigating the misconduct in question, and only four days before he was terminated. Indeed, by the time Mr. Yoho called the EAP, it is undisputed that BNY was seriously considering terminating Mr. Yoho, and had at least made a tentative decision to do so, subject only to a final interview of Mr. Yoho himself. For example, in a September 1, 2016, email exchange entitled "Getting all ducks in a row…," two BNY HR employees discussed the logistics of organizing a "term[ination] meeting" with Mr. Yoho. ECF 79-13. Mr. Pruett also testified that "[t]he decision at the end of that week [*i.e.*, September 2, 2016] was, barring the conversation that [HR investigator Thomas Galante] would have with [Mr. Yoho] … if things didn't change, then we would move to terminate." ECF 85-4, pp. 307:10-17. Mr. Yoho does not dispute this timeline. In fact, he argues that this evidence shows BNY had made a *final* decision to terminate him by September 2nd. *See* ECF 77, p. 11 n.1 (contending, based on the September 1, 2016, email, that there is "ample evidence" that Mr. Yoho was "actually terminated on September 2, 2016.").

Given this, the Court finds that BNY was under no obligation to pause its investigation of Mr. Yoho or alter any disciplinary decision, whether tentative or

otherwise, based on Mr. Yoho's EAP call and his possible desire for some sort of leave of absence. Any request for accommodation was, by then, "too little, too late" to trigger BNY's obligations under the ADA. *Jones*, 696 F.3d at 90. The Court will thus grant summary judgment on the disability-accommodation portion of count 1 and the corresponding portion of count 8.

## III. Mr. Yoho has not raised any genuine dispute of material fact as to his age- and disability-discrimination claims.

Separate and apart from his claims above, Mr. Yoho also claims that BNY terminated him on the basis of age and disability (alcoholism). The ADEA claim fails because Mr. Yoho has not met his *prima facie* burden of showing age discrimination. And both claims fail due to the absence of any evidence that would create a material dispute regarding pretext.

### A. Mr. Yoho fails to present a *prima facie* case of age discrimination.

To begin with, Mr. Yoho's age-discrimination claim fails at the threshold, because he has not presented sufficient evidence to establish even a *prima facie* case. The extent of Mr. Yoho's argument is that (1) he was 50 years old at the time he was fired; (2) he knows of another older wholesaler named Pat Johnson who was terminated by BNY (for reasons not in the record); (3) he is not personally aware of BNY hiring "an external wholesaler who is 50 years of age or older" (an assertion not supported by any other evidence in the record); and (4) he had conversations with his friend and supervisor Tim McCormick "about [wholesaling] being a 'young man's game' … due to the rigors of the life of the external wholesaler." ECF 90, pp. 8-11; ECF 85-3, pp. 106:2-201, 232:3-18; ECF 92-11, ¶¶ 22-37.

This is not enough. To establish a *prima facie* case of age discrimination under the ADEA, a plaintiff must show (1) that he is at least 40 years old; (2) that the defendant took an adverse employment action against him; (3) that he was qualified for the position in question; and (4) that he was replaced by another employee who

was sufficiently younger so as to support an inference of discriminatory animus. *See Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009). Where, as here, the plaintiff is not directly replaced by another employee whose age can be assessed, the fourth element can be established by showing other "facts which if otherwise unexplained, are more likely than not based on the consideration of impermissible factors." *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015) (cleaned up). Where the plaintiff seeks "to satisfy the fourth *prima facie* element with evidence that a similarly situated individual was treated differently," the comparator employee "must be similarly situated in all relevant respects, taking into account factors such as the employees' job responsibilities, the supervisors and decision makers, and the nature of the misconduct engaged in." *Chase v. Frontier Commc'ns Corp.*, 361 F. Supp. 3d 423, 436–37 (M.D. Pa. 2019) (cleaned up).

Here, Mr. Yoho offers something like comparator evidence, but it falls far short. To begin with, there is insufficient evidence that Pat Johnson—an older wholesaler who Mr. Yoho suggests was also fired—is a proper comparator. Mr. Yoho's burden is to point to some "evidence of similarly situated, *substantially younger* employees … not receiving discipline." *Willis,* 808 F.3d at 646 (emphasis added). Showing that BNY once fired another older employee, for reasons not in the record, does not gives rise to any discriminatory inference in Mr. Yoho's case. Further, Mr. Yoho admits that he knows nothing about the circumstances of Pat Johnson's termination, let alone any reason to believe Mr. Johnson was fired due to his age. ECF 85-3, pp. 106:2-20, 232:16-18.[4]

Separately, Mr. Yoho makes a generalized claim that BNY hires only younger wholesalers. ECF 92-11, ¶¶ 34-35. This also misses the mark. Again, Mr. Yoho's

[4] Even if this were enough to establish a *prima facie* case of age discrimination (and it is not), this "rumored, unspecified, and uncorroborated evidence concerning a single employee fails to establish pretext." *Willis*, 808 F.3d at 650.

burden, if he wishes to rely on comparator evidence, is to identify younger wholesalers, likely with the same supervisors, who were accused of similar misconduct yet treated differently. He has not done so. *See Chase*, 361 F. Supp. 3d at 436–37; *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011) ("[W]e accept the standard used by other circuits that to be considered similarly situated, comparator employees must be similarly situated in all relevant respects.").

Otherwise, Mr. Yoho points to no other facts that would allow for a *prima facie* inference of age discrimination. His alleged discussion with Mr. McCormick about how wholesaling was a "young man's game" establishes, at best, an irrelevant stray remark by a close friend of Mr. Yoho's who was not only uninvolved with the decision to fire him, but actually may have lobbied against it. ECF 1, ¶¶ 146-150; ECF 92-2, p. 323:15-20; ECF 85-14, pp. 220:2-221:6. Finally, Mr. Yoho's "own personal belief that the true reason for the discharge was [age] discrimination" is obviously "insufficient to create a genuine issue of material fact." *Ade v. KidsPeace Corp.*, 401 F. App'x 697, 703 (3d Cir. 2010). Even that much isn't clear—Mr. Yoho testified at his deposition only that he felt age discrimination was a "possibility." ECF 85-3, p. 231:17-19.

For all these reasons, the Court will grant summary judgment on count 2 and the corresponding portion of count 8.

**B. Mr. Yoho fails to show that BNY's asserted basis for firing him was a pretext to terminate him based on age or disability.**

Mr. Yoho's age and disability claims fail because he cannot establish sufficient evidence of pretext to get to a jury.[5]

---

[5] BNY argues that Mr. Yoho doesn't even get to pretext on his disability claim because he cannot demonstrate that he is disabled—which is part of his *prima facie* burden. This is a close call. Mr. Yoho has likely failed to show that he is actually disabled, given the lack of evidence of any chronic or permanent impairment caused by his alleged alcoholism. *See Maull v. Div. of State Police*, 141 F. Supp. 2d 463, 473 (D. Del. 2001) ("[T]emporary impairments caused by the periodic, and even frequent,

To begin with, there is no question that BNY has articulated a legitimate, nondiscriminatory reason for firing Mr. Yoho. "[W]orkplace misconduct is a legitimate and nondiscriminatory reason for terminating employment, even when such misconduct is related to a disability." *McElwee*, 700 F.3d at 641 (citations omitted). And there is also no question that "an employer may hold an alcoholic or drug-dependent employee to the same qualification standards for employment or job performance and behavior that such entity holds other employees, even if any unsatisfactory performance or behavior is related to the drug use or alcoholism of such employee." *Salley v. Circuit City Stores, Inc.*, 160 F.3d 977, 981 (3d Cir. 1998) (citing 42 U.S.C. § 12114(c)).

So the burden returns to Mr. Yoho, who must present evidence that BNY's stated reason for terminating him is pretextual. At the pretext stage, "some specificity is required to show that the reason given by the employer was weak, inconsistent or incoherent—enough to infer that animus could have motivated the decision." *Darby v. Temple Univ.*, 786 F. App'x 368, 370 (3d Cir. 2019). In other words, Mr. Yoho must point to evidence "from which a factfinder could reasonably

---

overindulgence of alcohol are insufficient to establish a substantially limiting impairment."), *aff'd* 39 F. App'x 769 (3d Cir. 2002); *Scheffler v. Dohman*, 785 F.3d 1260, 1261 (8th Cir. 2015) ("[D]riving while intoxicated on multiple occasions does not, in and of itself, establish that Scheffler is an alcoholic.") (cleaned up); *Burch v. Coca-Cola Co.*, 119 F.3d 305, 316 (5th Cir. 1997) (an alcoholic plaintiff must show impairments "qualitatively different than those achieved by an overindulging social drinker"). But he has probably established a dispute of fact that he was "regarded as" disabled by the primary decision-maker here, Mr. Pruett. *See Rubano v. Farrell Area Sch. Dist.*, 991 F. Supp. 2d 678, 691 (W.D. Pa. 2014) (Lenihan, J.) ("[A]ll that an ADA plaintiff must show to raise a genuine issue of material fact for the 'regarded as' prong is that a supervisor knew of the purported disability."). That assumption is plausible, because there is at least some evidence that Mr. Pruett had observed Mr. Yoho drinking to excess at work events and, further, seemed to feel this was indicative of a problem. ECF 85-4, p. 252:8-11 ("I had told John [Mussallem] that it felt like that [Mr. Yoho] was drinking more and that as a good friend that I know the two of them are, that he should have a talk with Keith.").

either (1) disbelieve the employer's articulated legitimate reasons, or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie,* 32 F.3d 759, 762 (3d Cir. 1994).

Mr. Yoho opts for the first path, arguing that "inconsistencies, contradictions, and irregularities" would allow a jury to infer pretext here. ECF 90, pp. 5-6. Unfortunately, he also says that "[it] is near impossible" to identify them in his briefing, "given the vast number of them." *Id.* at p. 6. So he instead refers the Court to the entirety of his 346-paragraph Concise Statement of Material Facts and all of the attached evidence. *Id.* He then provides "a few examples" of inconsistencies, several of which also refer the Court to more than 100 paragraphs of his Concise Statement. *Id.*[6]

The Court has reviewed the cited paragraphs and evidence carefully, and Mr. Yoho's assertions fall apart under scrutiny. To begin with, at least three of the "examples" Mr. Yoho cites are not really "examples" at all, since Mr. Yoho doesn't say what he is referring to with any specificity. Those are: (1) "[t]he numerous internal inconsistencies between the testimony of Defendants' witnesses including Pruett, Noland, Gilbert and Seybert," citing more than 100 paragraphs of his Concise Statement; (2) "[t]he numerous inconsistencies between the testimony and the notes attributed to Galante," citing nothing; and (3) "[t]he inconsistencies in Defendants' [30(b)(6)] testimony (Spezialetti)," citing ten paragraphs of his Concise Statement.

---

[6] This is not a helpful way for a litigant to resist summary judgment. "If factual support for [Mr. Yoho's] claim exist[s] in the record, it [is] incumbent upon [him] to direct [the Court's] attention to those facts." *DeShields v. Int'l Resort Props. Ltd.*, 463 F. App'x 117, 120 (3d Cir. 2012); *see also United States v. Claxton*, 766 F.3d 280, 307 (3d Cir. 2014) (parties "bear the responsibility to comb the record and point the Court to the facts that support their arguments.").

*Id.* While each of the many cited facts refer to evidence in the record, the description of what that evidence shows is either inaccurate or incomplete.

Still, as far as the Court can tell, the asserted "inconsistencies" are not the type of inconsistencies that are pertinent to the issue of pretext. Instead, at most, Mr. Yoho points to inconsistencies in statements and testimony of those who were interviewed in connection with Mr. Yoho's alleged harassment. But "[a]n internal investigation, like a judicial proceeding, often produces conflicting evidence and requires judgments about credibility and the weight to be given various pieces of information." *Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 417 (8th Cir. 2010). Thus, where an employer "relies on [witness] statements and complaints when making a decision to terminate an employee, the employee cannot later establish pretext by simply challenging the veracity of such statements." *Farrell v. Abbott Labs., Inc.*, No. 11-120, 2011 WL 4055167, at *9 (W.D. Pa. Sept. 12, 2011) (Schwab, J.) (cleaned up); *see, e.g., Ade*, 401 F. App'x at 703 ("Ade disputes the substance of the harassment claims, but cannot dispute that complaints were made to KidsPeace management and that KidsPeace investigated those complaints."). Such is the case here.[7]

---

[7] As for the alleged "inconsistencies" in the testimony of BNY's 30(b)(6) witness, Mary Spezialetti, Mr. Yoho argues in the cited paragraphs that there is an inconsistency between Ms. Spezialetti's testimony that BNY considered Mr. Yoho's conduct "in the aggregate" and the fact that BNY "did not consider any of [Mr. Yoho's] performance reviews from 2009 - 2016, including his rating of 'meets expectations' and 'achieved expectations' in the area of 'Corporate Inclusion.'" ECF 78, ¶¶ 273-83. This is not a material inconsistency. It's also not true. Ms. Spezialetti testified only that "[t]he performance ratings in those particular areas … don't negate the conduct that took place and they don't mitigate the conduct that took place.'" ECF 79-22, pp. 66:18-22. In any event, what matters here are "the criteria identified by the employer, not the criteria … the plaintiff thinks are important." *Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 648 (3d Cir. 1998). BNY was free to consider and weigh competing evidence as it saw fit. That it didn't consider Mr. Yoho's prior positive work performance as outweighing his recent problematic behavior isn't the type of inconsistency or implausibility that is relevant to pretext.

Nor is Mr. Yoho "entitled to an inference of discrimination" simply because BNY "believed the allegations against him," rather than accepting his denials. *Coulton v. Univ. of Pennsylvania*, No. 05-1446, 2006 WL 759701, at *8 (E.D. Pa. Mar. 21, 2006), *aff'd*, 237 F. App'x 741 (3d Cir. 2007). Mr. Yoho's "denial that he engaged in the conduct for which he was purportedly terminated is insufficient to create a genuine issue of material fact." *Ade*, 401 F. App'x at 703 (citation omitted). He must cast doubt on whether BNY really relied on its investigation, not show that BNY was mistaken or overly harsh. A federal court is not "a super-personnel department that reexamines an entity's business decisions." *Brewer v. Quaker State Oil Ref. Corp.*, 72 F.3d 326, 332 (3d Cir. 1995). "No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers," the appropriate inquiry is limited to "whether the employer gave an honest explanation of its behavior." *Id.*; *see Frymoyer v. E. Penn Mfg. Co., Inc.*, 757 F. App'x 97, 101 (3d Cir. 2018) (employee must show that employer "did not have an honest belief that he engaged in misconduct justifying termination."); *Willis*, 808 F.3d at 647 ("The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is discrimination.") (cleaned up).

Here, Mr. Yoho raises no genuine dispute over the material facts that BNY (1) conducted an investigation based on a report to HR made by Ryland Pruett; (2) interviewed multiple witnesses during that investigation, including the women involved in the alleged incidents and Mr. Yoho; (3) consulted with its counsel; and (4) decided to terminate Mr. Yoho. Mr. Yoho hasn't shown inconsistent explanations by BNY as to *why* it terminated Mr. Yoho (*e.g.,* it did not first suggest that he was terminated for poor performance and then later say he was terminated for misconduct). Indeed, the record clearly shows that BNY had evidence, including corroboration of certain key details by Mr. Yoho himself, to support its conclusion

that Mr. Yoho engaged in misconduct. Mr. Yoho's broad allegations of "inconsistencies" do not bear on the question of pretext.

Beyond those, Mr. Yoho points to about five other "examples" of evidence that he says establish pretext. None of them create a genuine dispute of material fact.

***First,*** Mr. Yoho says that BNY's investigator, Thomas Galante, was "directed to deviate from his typical investigation process" in his case. ECF 90, p. 6. This is a reference to the fact that Mr. Galante's investigation of Mr. Yoho was overseen by BNY's in-house counsel. ECF 86, ¶ 192. Asked if counsel typically directed his investigations, Mr. Galante responded that he "wouldn't say that it's usual," but that "it does occur." *Id.* at ¶ 193. A jury could not reasonably infer pretext from this alleged "deviation" from Mr. Galante's "usual" procedure. The involvement of legal counsel in this context does not create any sort of inference of pretext. *Cf. Burns v. Republic Sav. Bank,* 25 F. Supp. 2d 809, 827 (N.D. Ohio 1998) ("[T]he board took the trouble to seek legal advice regarding this issue at the time it promoted Burns . . . The board was told that it would not be discriminatory to deny Burns a golden parachute if it did not give parachutes to anyone else. The board followed this advice. This conduct is not consistent with a discriminatory motive.").

***Second,*** Mr. Yoho argues that the temporal proximity between his phone call to the BNY Employee Assistance Program and his termination is suggestive of pretext. ECF 90, pp. 11-13. Recall that Mr. Yoho called the EAP four days before he was terminated to seek help for his alcoholism. He suggests it is suspicious that "as soon as Pruett learned of [Mr. Yoho's] call to EAP, he chose to terminate [Mr. Yoho] the very next day on September 7th." ECF 90, p. 4. This argument is creative, but it doesn't jibe with the evidence. That is, Mr. Yoho ignores the undisputed fact that BNY had nearly completed its investigation and tentatively decided to terminate Mr. Yoho by September 2, 2016, the day before Mr. Yoho called the EAP. ECF 77, p. 11 n.1; ECF 79-13; ECF 85-4, pp. 307:10-17. "The Court need not rely on an *inference* of

causality based only on proximity in time when there is uncontroverted evidence of other causal factors which clearly justify the termination." *Driscoll v. Lincoln Tech. Inst.,* 702 F. Supp. 2d 542, 547 (E.D. Pa. 2010) (emphasis in original).

***Third,*** Mr. Yoho claims that pretext can be inferred from "inconsistencies in who Defendants claim the decision maker was in [Mr. Yoho's] termination." ECF 90, p. 11. That is, he argues that "[d]espite the fact that there are three separate documents … that identify Pruett as the decision maker, Pruett claims that he was not the sole decision maker." ECF 78, ¶ 267. But the documents cited by Mr. Yoho say only that Ryland Pruett was the "responsible," not "sole," decision-maker. *See* ECF 79-4, p. 5 ("Ryland Pruett was responsible for the decision to terminate Plaintiff's employment."); ECF 79-5 ("Also, note the decision maker as Ryland K. Pruett[.]"); ECF 79-6 ("The decision has been made by the appropriate departmental management[.]"). Nor can the Court find any other instance in which BNY described Mr. Pruett as the "sole" decision-maker or denied that he made the decision with a group. *See* ECF 85-4, p. 172:9-16 ("It was a group decision ... Joe Moran and me, with the help of HR."); ECF 79-22, pp. 71:24-72:2 ("Ryland Pruett was the responsible decisionmaker, but Ryland Pruett made his decision in consultation with human resources and with his own manager Joe Moran.").

***Fourth***, Mr. Yoho claims that pretext can be inferred from what he terms "[t]he destroyed / missing EAP notes." ECF 90, p. 6. This refers to notes Mr. Yoho believes are "missing" from his call to BNY's EAP phone line. ECF 78, ¶¶ 338-46. This argument is wholly speculative—the "evidentiary equivalent of a raised eyebrow[.]" *Naas v. Westinghouse Elec. Corp.*, 818 F. Supp. 874, 880 (W.D. Pa. 1993) (Brooks Smith, J.).

The undisputed facts are these: BNY outsourced responsibility for operating its EAP to a third-party entity, Beacon Health Options, that has no affiliation with BNY. ECF 78, ¶ 334. Mr. Yoho thus subpoenaed Beacon for documents relating to

his EAP phone call. *Id.* at ¶ 342. In response, Beacon produced documents, including one entitled "Related Notes," but that document reflected no notes related to Mr. Yoho's phone call. *Id.* at ¶ 343-44. There is no evidence that any such notes were taken in Mr. Yoho's case, no evidence that BNY had any control over or communication with Beacon, and no evidence about Beacon's notetaking practices. Speculation that a third party lost or destroyed documents that may not exist does not support an inference that BNY's reason for firing Mr. Yoho was pretextual. *See Marconi v. Moon Area Sch. Dist.*, 104 F. Supp. 3d 686, 703 n.6 (W.D. Pa. 2015) (Fischer, J.) ("[M]ere speculation and conjecture on the part of the plaintiff is no substitute for actual evidence[.]") (citations omitted).

***Fifth*,** Mr. Yoho argues that pretext can be inferred from the fact that BNY's investigator, Thomas Galante, reportedly lost "audio notes" of his witness interviews. ECF 90, p. 6. This is also the basis for Mr. Yoho's separate motion for spoliation sanctions. ECF 76; ECF 77. The notes in question were not recordings of Mr. Galante's witness interviews. Instead, Mr. Galante, who is blind, used a dictation device called a "Stenomask" to dictate his own audio notes in real time—notes that are essentially his bullet-point summaries of the witness interviews. ECF 85-5, pp. 16:12-23, 17:17-18, 18:22-20:4. A Stenomask is a device that covers the mouth and allows for dictation of notes without disrupting the interviewee. *Id.* at 17:21-18:6. Mr. Galante testified that he later "misplaced" his original audio notes, but BNY has produced a purported word-for-word transcription that it says was prepared by Mr. Galante's intern before the audio was lost. ECF 84, ¶ 103-04; ECF 91, ¶ 103-04; ECF 85-5, pp. 16:12-20:4.

Initially, the inadvertent loss of the audio notes here, standing alone, does not support an inference of pretext. Mr. Yoho's counsel was provided the written transcription of the audio, and had an opportunity to depose Mr. Galante and the

witnesses interviewed by Mr. Galante and ask them if the transcribed notes reflected what they said.

Beyond that, to raise an inference of pretext, there must be more than pointing to a document-preservation error by an HR employee. For example, Mr. Yoho has produced no evidence suggesting that Mr. Galante had any substantive say in the termination decision aside from conducting the fact-finding and investigation. *See* ECF 85-5, p. 14:6-8 ("… I was not a part of any recommendations or the decision-making in terms of actions regarding Mr. Yoho."). And even assuming the audio contained statements that contradicted witness testimony elsewhere, it does not alter the undisputed fact that BNY received complaints regarding Mr. Yoho. In short, the missing audio tapes do not provide any basis to infer pretext. *See Sarmiento v. Montclair State Univ*., 285 F. App'x 905, 911 (3d Cir. 2008) ("Given that Sarmiento has failed to cast meaningful doubt on any of the core facts underlying the nondiscriminatory rationale proffered by MSU, we believe that any inference that the university destroyed the committee notes with a view towards concealing unlawful discrimination would be highly speculative.").

Likewise, regarding Mr. Yoho's request for sanctions due to spoliation, the Court finds no basis to issue sanctions here, including Mr. Yoho's requested sanction of entering summary judgment in his favor or granting an adverse inference instruction. To obtain an adverse inference on the basis of spoliation, let alone summary judgment,[8] Mr. Yoho must present evidence showing "bad faith" on the part of BNY. *See Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 79 (3d Cir. 2012) ("A finding of bad faith is pivotal to a spoliation determination."); *see also Bozic v. City of Washington, Pa.*, 912 F. Supp. 2d 257, 270 (W.D. Pa. 2012) (Hornak, J.) ("Almost all

[8] While the Court has the authority to enter summary judgment in favor of a party as a sanction for spoliation, such "case-dispositive sanctions" are reserved for "extreme cases." *Bistrian v. Levi*, No. 08-3010, 2020 WL 1443735, at *4 (E.D. Pa. Mar. 24, 2020).

of the district court cases applying *Bull* … have declined to find spoliation where the party's conduct was no worse than negligent[.]") (citations omitted); *Rega v. Armstrong*, No. 08-156, 2016 WL 10999995, at *1 n.2 (W.D. Pa. June 20, 2016) (McVerry, J.) ("*Bull* makes quite clear that the Court cannot find spoliation and, in turn, impose spoliation sanctions without first making a finding of bad faith[.]").

"Bad faith, in this context, means that the defendant intentionally withheld the evidence." *Rega*, 2016 WL 10999995, at *1; *see also Bull*, 665 F.3d at 76-77 ("The key issue, however, is whether the discrepancy … was an intentional misrepresentation or—as her counsel insists—inadvertence."). Conversely, "no unfavorable inference arises when the circumstances indicate that the document or article in question has been lost or accidentally destroyed[.]" *Peterson v. Attorney Gen. Pa.*, 551 F. App'x 626, 628 (3d Cir. 2014). "The party seeking sanctions bears the burden of proving spoliation of evidence occurred." *Jacobs v. City of Pgh.*, 143 F. Supp. 3d 307, 311 (W.D. Pa. 2015) (Conti, C.J.).

Here, as discussed, Mr. Yoho has presented no evidence to rebut Mr. Galante's testimony that he inadvertently misplaced the audio notes. Nor, despite having every opportunity to question the interviewed witnesses, has Mr. Yoho identified reason to question either (1) that the interviews occurred, or (2) that the purported word-for-word transcription of Mr. Galante's audio notes was, in fact, prepared by Mr. Galante and his intern and is accurate. Thus, there is no evidence of bad faith and, further, no evidence of any resulting prejudice.[9]

---

[9] Had this matter been raised during discovery, the Court's preferred remedy would have been to allow Mr. Yoho to depose all interviewed witnesses; depose Mr. Galante and his intern; and obtain the transcribed notes despite any claim of privilege. *See Bistrian*, 2020 WL 1443735, at *16 (explaining that a court may determine that "[a] lesser sanction is adequate to cure the prejudice."). Mr. Yoho was able to do all those things anyway. Since he has uncovered no evidence of bad faith or prejudice through that discovery, the Court will not impose sanctions, or provide any other additional remedy. *See, e.g., Crown Castle USA Inc. v. Fred A. Nudd Corp.*, No. 05-6163, 2010 WL 1286366, at *16 (W.D.N.Y. Mar. 31, 2010) ("[A]n adverse inference instruction

Additionally, while an adverse inference can be a powerful sanction, that inference must be tailored to what the evidence would have likely demonstrated. The scope of any such inference "should not test the limits of reason." *Webb v. D.C.*, 146 F.3d 964, 974 (D.C. Cir. 1998); *see Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 109 (2d Cir. 2002) ("[T]he party seeking an adverse inference must adduce sufficient evidence from which a reasonable trier of fact could infer that the destroyed or unavailable evidence would have been of the nature alleged by the party affected by its destruction.") (cleaned up). Here, given the presence of the transcribed notes and the lack of any other evidence of discrimination by BNY, it would not be reasonable for the Court to allow a jury to infer that the entirety of Mr. Yoho's otherwise absent case—*i.e.,* evidence that BNY did not really rely on its investigation at all—could have somehow been found in the missing audio notes. A spoliation sanction is therefore inappropriate.

In sum, Mr. Yoho has offered only "unfounded suspicions and unsupported statements" that are "completely insufficient to establish pretext." *Darby*, 786 F. App'x at 370. The Court will therefore grant summary judgment on the age- and disability-discrimination portions of counts 1, 2, and 8.

## IV. BNY is entitled to summary judgment on Mr. Yoho's defamation and tortious-interference claims.

Lastly, BNY is entitled to summary judgment on Mr. Yoho's defamation and tortious-interference claims. Broadly speaking, these claims are based on Mr. Yoho's allegation that BNY "blackballed" him from other jobs in the industry after his firing. ECF 92-11, ¶ 44-45. The defamation claim further asserts that BNY has "caused"

---

may not be appropriate where the destruction of evidence has not prejudiced the movant.") (citations omitted); *Ruzhinskaya v. Healthport Techs., LLC*, 311 F.R.D. 87, 100 n.7 (S.D.N.Y. 2015) ("The Court … is prepared to state that if any sanction is imposed, it would take the form of a monetary sanction, rather than an adverse inference instruction. No adverse inference is merited here.").

some of his former co-workers to believe he is a "sexual harasser." *Id.* at ¶¶ 51-55. The tortious-interference claim is largely duplicative of the defamation claim, as it alleges that the tortious conduct at issue is the defamatory statements by BNY. *See* ECF 1, ¶ 292.

Despite his broad accusations, Mr. Yoho has identified only one actual statement by a BNY employee, to a single prospective employer, that is capable of evaluation. That is a statement made by Mr. Yoho's friend and former supervisor, Tim McCormick, to LoCorr, a company Mr. Yoho applied to for a job after he was fired. ECF 90, pp. 13-16, 18-20. The Court rejects Mr. Yoho's other theories out of hand, as they are based entirely on vague hearsay and speculation about the existence of unidentified defamatory statements that Mr. Yoho could have identified through third-party discovery, but did not. *See Ross v. Bd. of Educ. Greater Egg Harbor Reg'l High Sch. Dist.*, 658 F. App'x 97, 100 (3d Cir. 2016) (affirming grant of summary judgment where plaintiff "failed to identify the particular statement Defendants made that was allegedly defamatory.") (citation omitted); *Diodato v. Wells Fargo Ins. Servs., USA, Inc.*, 44 F. Supp. 3d 541, 563 (M.D. Pa. 2014) ("[I]nferences and an opportunity for defamation are insufficient, and plaintiffs must identify a specific statement in order to prevail.") (citation omitted); *Smith v. Sch. Dist. of Phila.*, 112 F. Supp. 2d 417, 429 (E.D. Pa. 2000) (defamation claimant must "specifically identify what allegedly defamatory statements were made by whom and to whom.") (citations omitted).

The Court turns, then, to the LoCorr statement. After Mr. Yoho was fired, he applied for a job at a company called LoCorr and was offered an interview. ECF 85-3, pp. 344:9-13, 345:17-19. During that process, one of the managers at LoCorr reached out to Mr. Yoho's friend and former supervisor at BNY, Tim McCormick, for a reference. *Id.* at pp. 293:24-294:4. Mr. McCormick testified that he tried to be "very complimentary" of Mr. Yoho's "sales skills" and "absolutely was trying" to help Mr.

Yoho land the job. ECF 85-14, pp. 313:11-15. However, when pressed by the LoCorr manager on why Mr. Yoho left BNY, Mr. McCormick initially said he "couldn't discuss it," but then added that Mr. Yoho was "not here because he simply ran a red light." *Id.* at pp. 312:2-24. Mr. Yoho claims this "red light" comment was defamatory.

When analyzing a defamation claim under Pennsylvania law,[10] the Court "must decide at the outset whether [the] statement[s] [are] capable of defamatory meaning." *Tucker v. Fischbein*, 237 F.3d 275, 281 (3d Cir. 2001) (citation omitted); *see also Cashdollar v. Mercy Hosp. of Pittsburgh*, 595 A.2d 70, 75 (Pa. Super. Ct. 1991) ("Whether a communication can be construed to have a defamatory meaning is a question of law for the court to determine.") (citations omitted). Where, as here, a claimant alleges "defamation by innuendo," the defamatory inference "must be warranted, justified and supported" by the defendant's statement. *Rudolph v. Safari Club Int'l*, No. 12-1710, 2018 WL 3145716, at *9 (W.D. Pa. June 27, 2018) (Eddy, Mag. J.) (citation omitted). "The question of whether innuendo is actionable as defamatory is a question of law." *ToDay's Housing v. Times Shamrock Communications Inc.*, 21 A.3d 1209, 1215 (Pa. Super. Ct. 2011) (citation omitted). The Court must "view the statement[] in context" and ask whether the "impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate," is capable of defamatory meaning. *Tucker*, 237 F.3d at 282 (cleaned up).

---

[10] Both parties agree that Pennsylvania law applies to these state-law claims. *See* ECF 90, pp. 16-20; ECF 83, pp. 17-18. Arguably, Ohio law could apply, since Mr. Yoho is domiciled in Ohio. *See Wilson v. Slatalla*, 970 F. Supp. 405, 414 (E.D. Pa. 1997) ("[T]he state of plaintiff's domicile generally has the greatest concern in vindicating plaintiff's good name and providing compensation for harm caused by the defamatory publication."). But since neither party has raised this and the Court's independent review of Ohio law shows no conflict regarding the applicable law, the Court applies Pennsylvania law. *See Fuchs v. Scripps Howard Broad. Co.*, 868 N.E.2d 1024, 1033 (Ohio Ct. App. 2006) ("Summary judgment is appropriate in defamation actions because whether words are defamatory is a question of law."); *Stainbrook v. Ohio Sec'y of State*, 88 N.E.3d 1257, 1263 (Ohio Ct. App. 2017) ("[A] true fact cannot be the basis for a defamation lawsuit.").

Here, the statement that Mr. Yoho "simply ran a red light" is not capable of defamatory meaning. At most, this statement implies that Mr. Yoho had been fired for cause. But a "statement," let alone a vague implication, "that someone has been terminated from employment or terminated for cause, without more, is not defamatory." *Pilkington v. CGU Ins. Co.*, No. 00-2495, 2000 WL 33159253, at *5 (E.D. Pa. Feb. 9, 2001) (citations omitted). Such statements encompass "an array of matters which would not subject one to public contempt or repel others[.]" *Id.*; *see, e.g. Krolczyk v. Goddard Sys., Inc.*, 164 A.3d 521, 532 (Pa. Super. Ct. 2017) (statement that teacher-plaintiffs were fired for "various reasons" and "for the good of the children" was not defamatory); *Eure v. Friends' Cent. Sch. Corp.*, No. 18-1891, 2019 WL 3573489, at *13 (E.D. Pa. Aug. 5, 2019) (statement informing parents that plaintiff-teachers had been "fired" was not defamatory); *Bull Int'l, Inc. v. MTD Consumer Grp., Inc.*, 654 F. App'x 80, 106 (3d Cir. 2016) (statement announcing termination of contract was not defamatory based on "strained innuendo" that was "not reasonable[.]"). So it is, here.

Additionally, the implication that Mr. Yoho was terminated for cause is true—which also causes his defamation claim to fail. *See Pacitti v. Durr*, 310 F. App'x 526, 528 (3d Cir. 2009) ("[T]ruth is an absolute defense to a defamation claim and a defendant need only show substantial, rather than complete, truth."); *Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc.*, 982 A.2d 94, 102 (Pa. Super. Ct. 2009) ("[T]ruthful statements" cannot "form the basis for a tortious interference with contract claim."), *aff'd*, 20 A.3d 468 (Pa. 2011); *Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 972 (3d Cir. 1985) ("The court may determine that allegedly defamatory statements are true if a reasonable jury could come to only one conclusion.").

Importantly, that implication remains true regardless of whether Mr. Yoho actually engaged in the conduct for which he was accused. *See McCarver v. PPG Indus., Inc.*, 552 F. Supp. 2d 1294, 1301 (N.D. Ala. 2008) ("Whether or not McCarver

and Calder actually engaged in sexual harassment, they were indeed terminated after being accused of violating PPG's sexual harassment policy. Thus, any statements disclosing the reason for the termination decision do not constitute slander/libel."); *London v. Sears, Roebuck & Co.*, 458 F. App'x 649, 651 (9th Cir. 2011) ("London's defamation claim fails because her allegations arise from Sears's true statement that she was terminated for violating the discount card policy."); *Devore v. City of Phila.*, No. 06-5095, 2008 WL 1793482, at *9 (E.D. Pa. Apr. 15, 2008) ("There is no genuine issue of fact as to whether Devore was arrested and his employment terminated. Although these actions were later found by a jury to have been illegal, that does not change the fact that they occurred. Thus, Devore's claim for defamation fails because the allegedly defamatory statements were true[.]").

In a certain sense, this conclusion aligns with the Court's finding regarding Mr. Yoho's employment-discrimination claims. Mr. Yoho has failed to establish any evidence of pretext to undermine BNY's legitimate non-discriminatory reason for his termination. He was terminated for cause. Any statements suggesting as much are therefore true and not actionable. For these reasons, the Court grants summary judgment on counts 6 and 7.

**CONCLUSION**

For the reasons discussed above, the Court grants Defendants' motion for summary judgment. The Court also denies Plaintiff's separate summary-judgment motion on spoliation. Final judgment will be entered in favor Defendants. An appropriate order follows.

DATED: December 14, 2020

BY THE COURT:

/s/ *J. Nicholas Ranjan*
United States District Judge